T. A. Page v. Commissioner. Lena Page v. Commissioner.
Page v. Commissioner
Docket Nos. 23666, 23667.
United States Tax Court
1951 Tax Ct. Memo LEXIS 237; 10 T.C.M. (CCH) 443; T.C.M. (RIA) 51147; May 10, 1951
John H. Binns, Esq., and A. B. Cunningham, Esq., 514 Fidelity Bldg., Tacoma, Wash., for the petitioners. John D. Picco, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings respondent determined deficiencies and penalties as follows: 5%
25%
50%
Docket No.
Petitioner
Year
Deficiency
Penalty
Penalty
Penalty
23666
T. A. Page
1942
$ 569.96
$126.75
$ 284.98
1943
404.46
85.38
202.23
1944
1,094.44
273.61
599.72
1945
2,483.70
620.93
1,241.85
23667
Lena Page
1943
618.16
$ 30.91
282.89
1944
1,136.04
56.80
284.01
1945
2,523.45
126.17
*238 The issues are: (1) Did respondent correctly determine the taxable income of petitioner T. A. Page for 1942, 1943, 1944 and 1945? (2) Did respondent correctly determine the taxable income of petitioner Lena Page for 1943, 1944 and 1945? The year 1942 is also involved in the determination for 1943 under the Current Tax Payment Act of 1943. (3) Did respondent properly impose the 50 per cent fraud penalty under section 293 (b), Internal Revenue Code, against petitioner T. A. Page for 1942, 1943, 1944 and 1945? (4) Did respondent properly impose the 5 per cent negligence penalty under section 293 (a) of the Code against petitioner Lena Page for 1943, 1944 and 1945? (5) Did respondent properly impose the 25 per cent delinquency penalty under section 291 (a) against petitioner T. A. Page for 1942, 1943, 1944 and 1945? (6) Did respondent properly impose the 25 per cent delinquency penalty under section 291 (a) against petitioner Lena Page for 1943 and 1944? The facts are stipulated in part and the stipulation is incorporated herein as part of our findings of fact. Findings of Fact Petitioners reside in Tacoma, Washington. Lena Page is the mother *239 of T. A. Page. She is also known as Mrs. J. A. Page and is the widow of J. A. Page who died on May 16, 1939, and to whom she was married in 1907. Prior to his death J. A. Page owned and operated a repair shop at 1126 Commerce Street, Tacoma, Washington. In connection with this business, J. A. Page also purchased and sold used cars, manufactured keys and repaired bicycles. Lena Page inherited this business upon her husband's death. Thereafter and at all times material to this proceeding Lena Page and her son, T. A. Page, operated a partnership under the name of Page Radio Service for the purpose of carrying on the business. Prior to February 8, 1946, petitioners had never filed any partnership or individual income tax returns. On that date, for the first time, petitioners filed a partnership return for Page Radio Service, for the year 1945. On the same day Lena Page filed, also for the first time, her individual income tax return for the year 1945. On July 18, 1946, petitioners filed delinquent partnership returns for Page Radio Service for the years 1942 to 1944, inclusive. On August 26, 1946, petitioners filed deliquent individual income tax returns for the years 1942 to 1944, inclusive. *240 The individual returns for Lena Page were signed by T. A. Page as her agent. T. A. Page has never filed an individual income tax return for the year 1945. The partnership returns contained the following pertient data: 1942
1943
1944
1945
Total
Net Income
$1,032.65
$1,010.95
$2,145.40
$900.00
$5,089.00
Distribution: T. A. Page
516.32
505.47
1,072.70
450.00
2,544.49
Lena Page
516.33
505.48
1,072.70
450.00
2,544.51
The returns of T. A. Page reported the following net income and tax: 1942
1943
1944
Total
Net Income
$858.42
$505.47
$1,072.70
$2,436.59
Tax
62.94 none
105.00
167.94
The returns of Lena Page reported the following net income and tax: 1942
1943
1944
1945
Total
Net Income
$1,035.45
$537.08
$700.16
$545.85
$2,818.54
Tax
95.52
none
46.03
none
141.55
The above returns were filed with the collector of internal revenue for the district of Washington. T. A. Page (hereinafter sometimes referred to as petitioner), was the active partner of the partnership described above, and operated the radio shop without the assistance of any employees. *241 Lena Page was sickly and feeble during the period here involved and took little part in the operations of the business. She was 70 years old, petitioner 40 years old, at the time of the hearing. During the tax years petitioner, in the operation and management of the business, repaired radios, manufactured keys, sold radio tubes, and assembled and sold home made radios on standard chassis of nationally advertised sets. The Page Radio Service shop at 1126 Commerce Street was 15 feet wide by 30 feet long, with a small entrance, a showcase against one wall, a work counter and key-making machine along the back wall, and radios, parts, keys, etc. Petitioners maintained a much larger stock in the basement of their home on Grant Street, Tacoma, where T. A. Page assembled and sold radios, which he advertised in the local papers during the tax years. Petitioner had difficulty getting radio parts during the war years, but he spent some time in 1941 and 1942 purchasing parts, frequently at retail, in anticipation of the shortage and he traveled up and down the coast for this purpose. He was drafted in 1942, but was released after three months at Fort Lewis. Petitioner also bought radio tubes *242 and parts from wholesale houses in Tacoma, and some from Radio Products Sales Company, Seattle, Washington. He purchased RCA cabinets from Liberty Sales Company, New York, and condensers from John Radio, Inc., Seattle. He was also able to purchase a few tubes at Zobrist Wholesale Radio House, Seattle, in 1945, and obsolete tubes from General Electric Company, Seattle. He furnished material to the Geary Metal Shop in South Tacoma for the purpose of making chassis for installation in RCA cases and cabinets. He did business with A. T. Stuart and Company, Tacoma, during 1944 and 1945, and a little business with the C.N.G. Radio Supply House, Tacoma. Walter West of the Tacoma Better Business Bureau, a non-profit organization organized to promote honesty and integrity in business, truthfulness in advertising and fair competition in trade, visited petitioner at the Commerce Street shop between 12 and 15 times during the tax years to investigate complaints made by the public of overcharges on radio tubes and sales of radios represented as Philco and RCA makes which were in reality assembled by petitioner. He admitted to West that he charged in excess of OPA prices. Petitioner's reputation *243 as a businessman was bad. The collector of internal revenue for the district of Washington investigated the liability of T. A. Page d/b/a Page Radio Service for manufacturer's excise tax for the manufacture and sale of radios in 1944 and 1945. As a result of the investigation an assessment was made against petitioner for manufacturer's excise tax for the years 1944 and 1945 under the Internal Revenue Code. The assessment was protested by petitioner but was paid after issuance of notice and demand. He paid the amount of $1,308.75 as follows: Net tax
$ 976.20
Penalty
235.13
Accrued interest
97.42
Total
$1,308.75
Petitioner operated the Page Radio Service as a strictly cash business and the income tax returns described above were filed on the cash receipts and disbursements basis. Petitioner kept the following described records in connection with the operation of the business: (1) A tablet purporting to show certain receipts and expenditures on a daily basis from February 12, 1943, to October 23, 1943. (2) A group of bank deposit slips purporting to show certain receipts and expenditures on a daily basis from October 25, 1943, to December 31, 1943. (3) A group *244 of bank deposit slips purporting to show certain receipts and expenditures on a daily basis for the calendar year 1944. (4) A group of bank deposit slips purporting to show certain receipts and expenditures on a daily basis for the calendar year 1945. (5) A small daily account book purporting to show certain monthly totals representing net receipts for each month from August, 1935, to February, 1946. There are no records of daily receipts for the year 1942. The records above-described failed to reflect periodical expenses such as rent, garbage and telephone, and do not include income from the sale in 1944 and 1945 of radios which were manufactured by petitioner at his home. The daily records reflect the sale of 8 radios in 1944 and 18 radios in 1945. There are no records showing the purchase of merchandise and supplies, or inventories of radios, radio parts and other supplies, or any supporting invoices, vouchers, receipts and cash register slips. The printed forms of the National Bank of Washington, Tacoma, on which petitioner purportedly recorded his business receipts and expenditures from December 28, 1944, to January 19, 1945, were not shipped by the printers until January 8, 1945, and *245 not received by the bank and made available to the public before January 19, 1945. The purported records for the period December 28, 1944, to January 19, 1945, show payments received for making 57 keys and repairing 19 radios. On November 7, 1945, the office of the collector of internal revenue at Tacoma and the special agent in charge jointly began an investigation of the income tax liability of petitioners for the years 1942 to 1945, inclusive. In connection with this investigation W. J. Pierce, deputy collector of internal revenue, accompanied by another of respondent's examining officers, entered petitioner's shop on Commerce Street on that date. While there, Pierce observed customers hand petitioner approximately $15 in payments on radio repair work and purchases. Petitioner's purported daily record of receipts for November 7, 1945, disclosed total receipts of only $5.30 for that particular day. The partnership income tax return for 1945, prepared by counsel for petitioners on February 8, 1946, contains a notation on page 4 thereof, in the handwriting of said counsel, providing that "This return was prepared from statements made by partner, no audit, no records examined - *246 but believed to be correct. [Initialed] A.B.C." On November 7, 1945, the examining officers and T. A. Page examined the contents of a safe deposit box, being No. 128, of the Broadway Safe Deposit Company, Fidelity Building, Tacoma. The safe deposit box was rented on December 24, 1942, and registered in the name of Lena Page with T. A. Page having the right of access thereto. Upon examination, the safe deposit box was found to contain $25,080 in new small-dimensioned currency. This currency was divided into four bundles in the following amounts, secured by bank wrappers bearing the dates indicated below: Date on Wrapper
Amount
September 18, 1942
$ 1,000
April 19, 1943
2,000
July 28, 1944
10,000
Undated
12,080
Total
$25,080
In addition to the above currency the examination disclosed a man's ring with three large diamond settings; a certificate of title for a 1941 Cadillac coupe; a deposit book on the Pudget Sound National Bank, Tacoma, showing a savings deposit of over $5,000; a conditional sales contract providing for the sale in 1942 by Lena Page of a piece of real property on Kay Street for the price of $2,000; and two sealed envelopes bearing the *247 notation that they contained the will of Lena Page. The records of the Broadway Safe Deposit Company covering entries to the above safe deposit box revealed that all of the entries had been made by T. A. Page. These records reveal that 116 entries were made by T. A. Page from December 24, 1942, to November 7, 1945. The records show that one of these entries was made by T. A. Page at 3:15 P.M., January 10, 1945. The savings account in the Pudget Sound National Bank was opened in 1945 in the name of Lena Page with a single deposit, which, with interest, amounted to $5,037.55. T. A. Page had no right to withdraw these funds or sign any orders on this account. Lena Page also had a savings account in the National Bank of Washington, Tacoma, carried in the name of Mr. and Mrs. J. A. Page, which reflected deposits of $4,172.16 for years 1942 to 1945, inclusive, as follows: Year
Amount
1942
$3,938.99
1943
74.12
1944
100.51
1945
58.54
Total
$4,172.16 T. A. Page had no right to withdraw these funds or to sign any orders on this account. When J. A. Page died on May 16, 1939, he left an estate which in due time was distributed to Lena Page. This estate included *248 the family home, a frame house located at 1205 So. Grant Street, Tacoma, valued at $2,800 less a mortgage of $500 and accrued interest of $30; the Kay Street property valued at $900; tools of the radio repair shop at 1126 Commerce Street valued at $100, and household furnishings valued at $100. In connection with the shop Lena Page also inherited three or four used cars having an estimated value of $650. In 1940 Lena Page purchased a piano on credit. In 1943 she purchased a Cadillac and paid cash for it. In December, 1939, there was a burglary of petitioners' home on Grant Street. Some jewelry was stolen and from $80 to $100 in cash. The examining officers reconstructed petitioners' income on the basis of the currency in the safe deposit box, the deposits in the National Bank of Washington and the Pudget Sound National Bank, and various expenditures incurred by them, such as living expenses, medical expenses, purchases of watch and jewelry, and purchase of a Cadillac automobile. The currency was considered partnership income in the years shown on the dated wrappers. The undated bundles, containing $12,080, were regarded as income made in 1945. The bank deposits were considered *249 income in the years of deposit. The expenditures for jewelry and watch, based on information received from jewelers Weisfield and Goldberg, were considered income in the years when the expenditures were incurred. The expenditure for the Cadillac, in an amount equal to the difference between the purchase price of the Cadillac and the trade-in value of the 1940 Plymouth, was deemed income in 1943, the year of purchase. The living expenses were based on an analysis of the sales tax reported in petitioners' delinquent income tax returns. The medical expenses represented amounts actually expended by petitioners and were considered income in 1944, the year of expenditure. The addition of the respective amounts in currency, deposits and expenditures, after allocation to the tax years on the basis indicated, was accepted as the unadjusted partnership income. From the unadjusted partnership income were eliminated specific items such as wages and profit from the sale of the Kay Street home. The resulting amount was regarded as the true partnership net income. No business records of Page Radio Service were submitted to respondent's agents during the investigation of petitioners' taxable income *250 for the years here in question. Respondent reconstructed petitioners' income for the tax years as follows: Items
1942
1943
1944
1945
Total
Currency - Safe Deposit Box
$1,000.00
$2,000.00
$10,000.00
$12,080.00
$25,080.00
Deposits - National Bank of Washing-
ton
3,938.99
74.12
100.51
58.54
4,172.16
Deposits - Puget Sound National Bank
5,037.53
5,037.53
Jewelry and Watch
95.07
100.00
343.55
538.62
Cadillac Automobile
1,200.00
1,200.00
Living Expenses
1,904.93
1,800.00
1,250.00
1,500.00
6,454.93
Medical Expenses
400.00
400.00
Unadjusted Net Income
$6,938.99
$5,174.12
$11,750.51
$19,019.62
$42,883.24
Less: Wages - T. A. Page
357.10
357.10
Sale of Real Estate -
Interest
70.12
162.58
137.93
107.41
478.04
Principal
305.47
265.54
961.28
378.66
1,910.95
$ 732.69
$ 428.12
$ 1,099.21
$ 486.07
$ 2,746.09
Partnership Income
$6,206.30
$4,746.00
$10,651.30
$18,533.55
$40,137.15
Distribution: Lena Page
$3,103.15
$2,373.00
$ 5,325.65
$ 9,266.77
$20,068.57
T. A. Page
3,103.15
2,373.00
5,325.65
9,266.78
20,068.58
Petitioner told deputy collector Pierce on November 7, 1945, at *251 the time the safe deposit box was inventoried, that he did not have the "least idea" as to the source of the currency in the box. Lena Page told Pierce and deputy collector Singleton on November 13, 1945, that she received $15,000 from her father, that her husband left her property in the form of used cars and notes receivable from which she realized cash, but she mentioned no other sources of the currency. Petitioner told Ira Eppler, special intelligence agent who also participated in the investigation, on February 27, 1946, that it was his understanding that the currency in the safe deposit box constituted gifts to Lena Page from her family and repayments of a loan made to Frank Page, Lena Page's brother-in-law. Lena Page told Eppler on February 27, 1946, that she had received gifts of currency of $10,000 from her grandfather, $5,000 from her mother when T. A. Page was one year old (about 1911), and $15,000 from her father, in that order, in each instance just before these persons had died. The first gift, she stated, had been held by her parents until she married and then given to her at that time. When asked by respondent's agents on November 13, 1945, where the alleged hoarded *252 money had been kept, Lena Page showed them two fruit jars in the attic of her home. Petitioner told respondent's examining officers on February 27, 1946, that the money had been buried in the basement in a coffee can and that the can was wrapped in some type of waterproof material such as oilcloth or tarpaper. Petitioner stated in a written sworn statement made on June 11, 1947, that the money had been buried in "an old can under the house". Petitioner told Eppler on February 27, 1946, that the hoarded currency placed in the safe deposit box was the same currency in the safe deposit box that Pierce had inventoried on November 7, 1945. When it was pointed out to him that the inventoried currency was the small size in present use and not the former large size in use before 1928, Page replied that that had slipped his mind and that he had taken it out and exchanged it in small amounts in three banks in Tacoma. In the sworn statement of June 11, 1947, T. A. Page stated in part: "That he did not know anything of the money his mother had until some time after his wife left him in 1940 or early part of 1941, when his mother told him of the money which she had hidden in the house. It *253 was all in large size or blanket bills. That shortly thereafter he began taking these bills down town to the banks in very small amounts and changing them over for the small size present day bills." The books and records maintained by petitioner T. A. Page do not reflect the true net income of the partnership, and of the petitioners, for the years 1942 to 1945, inclusive. Respondent's determination of the true net income of the partnership, and of the petitioners, as set forth above, is reasonable and proper. The omissions and understatements of taxable income by petitioner T. A. Page for the years 1942 to 1945, inclusive, were intentional, and part of the deficiency for each of those years was due to fraud with intent to evade tax. The failure of petitioner T. A. Page to file timely returns for 1942, 1943, 1944 and 1945 was not due to reasonable cause. The failure of petitioner Lena Page to file timely returns for 1943 and 1944 was not due to reasonable cause. A part of the deficiencies in income tax of petitioner Lena Page for 1943, 1944 and 1945 was due to negligence or intentional disregard of rules and regulations. Opinion The first question is whether income was *254 received by petitioners from 1942 through 1945 which was not reported by them, and, if so, whether respondent's determination of the amounts of such unreported income is correct. As our findings indicate, our answer to both parts of this question is in the affirmative. Petitioners admit that they kept very meager records of the receipts and expenditures of the radio shop operated by them. No records whatsoever were introduced in evidence for 1942, petitioner T. A. Page testifying that the records kept for that year had been mislaid. Moreover, the purported records introduced in evidence for the other years here in question, it has been stipulated, do not include income from the sale in 1944 and 1945 of radios which were manufactured by T. A. Page at his home. Nor do these purported records, it has been stipulated, reflect periodical expenses such as rent, garbage and telephone, or show purchases of merchandise and supplies, or inventories of radio parts and other supplies. Nor were any supporting invoices, vouchers, receipts and cash register slips introduced in evidence. Finally, unrefuted testimony and positive documentary evidence show that the printed forms of the National Bank *255 of Washington on which T. A. Page purportedly kept his records from December 28, 1944, to January 19, 1945, were not shipped by the printers until January 8, 1945, and not received by the bank and made available to the public before January 19, 1945. T. A. Page first testified on direct examination that he kept these records daily at the shop and took them home at the end of each day and showed them to his mother, petitioner Lena Page. He testified to the same effect on cross examination. His explanation of how he obtained the forms from the bank before they were shipped by the printers or made available to the public, was "I had a friend down there who got them for me." Later T. A. Page took the stand again on rebuttal and gave as a new explanation that he had left Tacoma in the latter part of December, 1944, and gone to Los Angeles, where he had remained two or three weeks, that his mother had watched the shop in his absence, that on his return he had obtained the printed bank forms, and that he had then entered the daily transactions of the back period from memoranda kept by his mother. But this explanation is impeached by the records of the Broadway Safe Deposit Company, Tacoma, *256 Washington, which show that T. A. Page entered the safe deposit box at 3:15 P.M., January 10, 1945, and therefore must have been in Tacoma on that date. In view of these glaring discrepancies in petitioner's testimony concerning the purported records for the period December 28, 1944, to January 19, 1945, we can not conclude that these were reliable and genuine records contemporaneously kept by him. We are impelled to the conclusion that such purported records were fabricated after respondent's tax investigation had been completed in February, 1946, since such purported records were never shown respondent's agents during that investigation. Moreover, the falsity of these particular records casts doubt as to the genuineness of all the similar records introduced in evidence by petitioners, none of which were shown respondent's agents during the investigation. As said in Pincus Brecher, 27 B.T.A. 1108, "The maxim, 'falsum in uno, falsum in omnibus,' may be a harsh rule, but here it seems justified." The testimony of respondent's examining officer that during a visit to the Page Radio Service shop on November 7, 1945, he saw T. A. Page receive approximately $15 in payments, *257 when the purported records for that day show receipts of $5.30, does not encourage confidence in such records. From all that we have said, therefore, we are convinced that respondent was justified in disregarding petitioners' purported records as inadequate and unreliable, and in determining petitioners' income for the tax years from bank deposits, accumulations of currency, and other information available. Section 41, Internal Revenue Code; Louis Halle, 7 T.C. 245; affd. (C.A. 2, 1949), 175 Fed. (2d) 500; certiorari denied, 338 U.S. 949. We have set forth in our findings the method by which respondent has made his determination. Petitioners dispute this determination in its entirety. Specifically and principally, petitioners allege that approximately $35,000 of the $40,137.15 determined by respondent to be income of the Page Radio Service for the years 1942 to 1945, inclusive, represented hoarded currency belonging to petitioner Lena Page before January 1, 1942. She first testified that she was given $15,000 by her grandfather when she was about 14 (about 1894), which her mother and father held for her until she *258 was married (in 1907) or shortly thereafter, and that they then turned over this amount to her. A little later she corrected her testimony to state that the sum given by her grandfather had been $10,000. She also stated that her grandfather had made the gift about 1900. She testified that she had been given the sum of $15,000 in bills by her father. She first stated he gave her this amount "in the 30's." She then stated he gave it when her son, petitioner T. A. Page, was about four or five years old. Upon counsel for petitioners pointing out that T. A. Page was 40 at the time of the hearing, she agreed that she must have received this money about 35 years before (about 1915). Petitioner Lena Page further testified that her mother gave her $5,000 about a year or a year and a half after she was married in 1907. She further testified that she and her husband had bought shares of stock and that after her husband's death in 1939 she sold the stock for between $4,000 and $5,000. When the investigation of petitioners' tax liability began in November, 1945, Lena Page had told respondent's examining agents of the purported $15,000 gift from her father, but not of any gifts from her grandfather *259 or mother. She also stated that her husband left her used car and notes receivable, but she said nothing about realizing cash from the sale of stock. Petitioners testified generally that Lena Page had hoarded these amounts prior to the tax years in currency in a receptacle hidden in their house, except for $10,000 loaned to Frank Page, her bother-in-law, in about 1920, which he repaid by mail over a period of from 20 to 25 years. Lena Page testified that the receptacle was a metal box, steel or copper, of about the shape of a shoebox, but smaller, hidden in the basement of her home. When asked by respondent's agents on November 13, 1945, where the alleged hoarded money had been kept, she had shown them only two fruit jars in the attic of her home. At the hearing she testified she kept only small amounts for daily expenses in the attic. T. A. Page testified that the receptacle was a small, copper-plated, metal box about a foot long, eight or nine inches wide, and about three inches deep, with a lid and a hasp. However, he had told respondent's examining officers on February 27, 1946, that the money had been buried in the basement in a coffee can, which was wrapped up in some type *260 of waterproof material, such as oilcloth or tarpaper. Lena Page testified that the box she described was not wrapped up in oilcloth. T. A. Page also stated in a written sworn statement made on June 11, 1947, that the money had been buried in "an old can under the house". Lena Page testified that she decided to transfer the hoarded currency to a safe deposit box because she was alarmed by a burglary of the house that took place in December, 1939. She did not rent a safe deposit box until December 24, 1942. When asked on cross examination why she waited until then to rent the box, she stated that as long as she had her son, T. A. Page, home with her she was not afraid and that she did not become afraid until she knew "that he had to go away to war". T. A. Page was drafted in 1942 and released after three months at Fort Lewis. Both petitioners testified that it was T. A. Page who transferred the hoarded money to the safe deposit box. T. A. Page testified that he transferred all the hoarded money from under the house to the safe deposit box in small quantities making more than 28 trips in 1943 and taking over a year to complete the transfer. In reply to a question by the Court as to *261 why he did not transfer all of the money at one time, he answered, "I didn't care to do so." The $25,080 in currency which the safe deposit box contained when examined by respondent's agents on November 7, 1945, consisted entirely of the present small-sized bills, not issued by the Government until 1928 and thereafter. Yet, according to petitioners' story, most of the money in the safe deposit box consisted of gifts from Lena Page's family which had been hoarded for many years prior to 1928. Moreover, T. A. Page told respondent's agents on February 27, 1946, that the hoarded currency which he transferred from the basement to the safe deposit box was the identical currency which respondent's agents inventoried in the safe deposit box on November 7, 1945. When it was pointed out to him that the inventoried currency was the small size in use only since 1928, T. A. Page replied that that had slipped his mind and that he had exchanged it in small amounts in three banks in Tacoma. In his written sworn statement of June 11, 1947, T. A. Page stated that "all" the hoarded money was in large size bills, that shortly after 1940 or 1941 "he began taking these bills down town to the banks in *262 very small amounts and changing them over for the small size present day bills". The plain implication of this statement is that the currency was taken from the basement and exchanged before deposit in the safe deposit box. But in his testimony at the hearing T. A. Page flatly contradicted this previous sworn statement. He testified on cross examination that some of the money in the basement was in "big, old bills, and some of it was in smaller bills". He also testified: "Q. But, nevertheless, you did not change that money into other currency until after you deposited it in the safe deposit box, did you? "A. I believe not - no." T. A. Page further testified that he exchanged the currency because he "kind of had a good time in general with it" and "just to be changing it, more than anything else". In view of the above and many other outright discrepancies, absurdities, and implausibilities in the hoarded money story, we are not required to believe it. Carmack v. Commissioner (C.A. 5, 1950), 183 Fed. (2d) 1; certiorari denied, 340 U.S. 875; O'Laughlin v. Helvering (C.A. D.C., 1935), 81 Fed. (2d) 269; *263 Rand v. Helvering (C.A. 8, 1935), 77 Fed. (2d) 450. Certainly petitioners have not met their burden of proof that all or any part of the amounts determined by respondent to be income in the tax years constituted funds saved prior to those years. We accordingly approve that determination. Moreover, whether the amounts represented legitimate income from petitioners' business, income from black market sales in which T. A. Page admittedly participated during the tax years, or income from other sources, it was not incumbent on respondent to prove the exact source of such funds in order to determine that they constituted income. Hague Estate v. Commissioner (C.A. 2; 1943), 132 Fed. (2d) 775; certiorari denied, 318 U.S. 787; Russell C. Mauch, 35 B.T.A. 617; affd. (C.A. 3, 1940), 113 Fed. (2d) 555. See Carmack v. Commissioner, supra.
The next issue herein is whether petitioner T. A. Page is liable for the fraud penalties imposed for the tax years 1942 through 1945. *264 Respondent has the burden of proving fraud. As said in M. Rea Gano, 19 B.T.A. 518, 533: "A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose." We think that the record and circumstances herein overwhelmingly indicate that the omission of large amounts of income by petitioner T. A. Page from his returns for the above years was due to fraud with intent to evade tax. The fabrication of records in whole or in part for the tax years, the "patently lame and untenable" explanations, replete with contradictions, for deposits and accumulations of funds, such as that some $35,000 represented hoarded money dating in part back to 1894, half a century ago, T. A. Page's black market operations and bad business reputation - see Wallace H. Petit, 10 T.C. 1253 - all these factors and many others unmistakably point to fraud. We hold that petitioner T. A. Page is liable for fraud penalties of 50 per cent of the deficiencies *265 in his returns for 1942, 1943, 1944 and 1945. Section 293 (b), I.R.C.
Respondent also asserted 5 per cent negligence penalties against petitioner Lena Page for 1943, 1944 and 1945. From everything we have said above, it is quite clear that petitioner Lena Page has not shown that the omission of income from her returns for those years was not due to negligence or intentional disregard of rules and regulations. Section 293 (a), I.R.C. The imposition of negligence penalties against petitioner Lena Page is sustained. As the facts show, petitioners had never filed any income tax returns before respondent's investigation began on November 7, 1945. During 1946 petitioner Lena Page filed delinquent returns for 1942, 1943, 1944, and a timely return for 1945 and petitioner T. A. Page filed delinquent returns for 1942, 1943 and 1944. He has never filed a return for 1945. Respondent imposed 25 per cent delinquency penalties against petitioner Lena Page for 1943 and 1944, and against petitioner T. A. Page for 1942, 1943, 1944 and 1945. Petitioners have not shown that their failure to file timely returns was due to reasonable cause and not due *266 to willful neglect. Section 291 (a), I.R.C. Accordingly, the delinquency penalties were properly imposed. Decisions will be entered for the respondent.